1

2

3

4

5

6

7       **IN THE UNITED STATES DISTRICT COURT FOR THE**

8             **EASTERN DISTRICT OF CALIFORNIA**

9

10   KELVIN SINGLETON,                    NO. 1:08-cv-00095-AWI-GSA-PC
                                        )
11                      Plaintiff,      )   FINDINGS AND
                                        )   RECOMMENDATIONS RE
12        v.                            )   DEFENDANTS' MOTION FOR
                                        )   SUMMARY JUDGMENT
13   A. YOUSSEF, et al.,                )
                                        )   (ECF No. 147)
14                      Defendants.     )
                                        )   OBJECTIONS DUE IN THIRTY
15   _____)   DAYS

16

17
         Plaintiff is a state prisoner proceeding pro se in this civil rights action.  The matter was
18
     referred to a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule
19
     302.  Pending before the Court is Defendants' motion for summary judgment.  Plaintiff has
20
     opposed the motion.[1]
21
     **I.    Procedural History**
22
          This action was initiated by civil complaint filed on January 18, 2008.  Plaintiff, an
23
     inmate in the custody of the California Department of Corrections and Rehabilitation, filed this
24
     lawsuit challenging the conditions of his confinement.  Specifically, Plaintiff claims that he was
25
     subjected to inadequate medical care such that it violated the Eighth Amendment's prohibition
26

27       _____
            [1] On November 2, 2009, the Court issued and sent to Plaintiff the summary judgment notice required by
28   Rand v. Rowland, 154 F.3d 952 (9th Cir. 1998), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).  (ECF
     No. 36.)

on cruel and unusual punishment.  On November 18, 2008, the Court screened the complaint and

issued an order requiring Plaintiff to amend the complaint to comply with Federal Rule of Civil

Procedure 18(a).  On December 9, 2008, Plaintiff filed a first amended complaint.  On January

14, 2009, the Court screened the first amended complaint, finding that the first amended

complaint stated cognizable claims and delineating the deficiencies with the other claims.

Plaintiff was directed to notify the Court of his willingness to proceed on the cognizable claims

or file a second amended complaint that addressed the deficiencies identified in the order.  On

February 12, 2009, Plaintiff filed the second amended complaint on which this action now

proceeds.   The Court found that the second amended complaint stated a cognizable claim under

section 1983 against the following Defendants: Chief Medical Officer (CMO) A. Youssef; S.

Lopez, M.D.; J. Akanno, M.D.; S. Qamar, M.D.; Dr. Vasquez, M.D.; Registered Nurse II (RN)

Ali; RN Wright-Pearson.   The Court specifically found that Plaintiff stated a claim for deliberate

indifference to his serious medical needs in violation of the Eighth Amendment.  On March 30,

2010, Defendants Youssef, Lopez, Akanno and Ali filed an answer.  On December 20, 2010,

Defendants Qamar and Wright-Pearson filed an answer.  On February 22, 2011, Defendants

Akanno, Ali, Lopez, Qamar, Wright-Pearson and Youssef filed a motion for summary judgment.

On April 5, 2011, Defendant Vasquez filed an answer and a joinder in the motion for summary

judgment.

## II.   Allegations

### A.   Medical Care for Eye Pain

On April 11, 2006, Plaintiff was transferred from Lancaster State Prison to Kern Valley

State Prison (KVSP).  Plaintiff had preexisting medical conditions, including glaucoma,

refractory error, and chronic low back pain due to degenerative disc disease, bulging disc, and

lordosis.[2]  Plaintiff notified medical staff of his medical conditions and showed them medical

---

[2] Lordosis is an exaggerated forward curvature of the lumbar and cervical regions of the spinal column.
*Medline Plus, Merriam Webster Medical Dictionary.*  http://www.merriam-webster.com/medlineplus/lordosis (last
visited February 2, 2012).

2

chronos from Lancaster State Prison.

On May 2, 2006, Plaintiff completed a medical form requesting to have his eyes checked and his broken glasses replaced, stating that his eyes were hurting and he had headaches.   In July 2006, Plaintiff was seen by an optometrist and fitted for glasses.  When Plaintiff requested that his ocular pressure be checked due to his headaches and hurting eyes, the optometrist stated he could not perform such a test because the prison did not have the necessary tools.  Plaintiff contends that his pressure should be checked every ninety days.

On September 1, 2006, Plaintiff met with Dr. Akanno and complained that his left eye "was very painful" and had been swollen for three weeks.  Dr. Akanno filled out a specialty request as "urgent" for Plaintiff to be seen by an eye specialist.  However, Acting CMO Youssef denied the referral, and Plaintiff alleged that he was never seen by a specialist regarding his eye pain.

On October 28, 2006, after suffering continual pain and some vision loss in his left eye, Plaintiff again submitted a request to be seen by an ophthalmologist.  Plaintiff's eye pressure had not been checked for nine months.

On November 28, 2006, as a result of Youssef's denial of the September 1, 2006, referral, Dr. Akanno referred Plaintiff to optometry to have his eye pressure checked.

On February 13, 2007, Plaintiff was seen by an optometrist and again fitted for glasses.  Plaintiff explained about the pain in his eye and vision loss and asked if his eye pressure could be checked.  The optometrist stated that he did not have the equipment to check it.  The optometrist referred Plaintiff to the ophthalmologist, who is the specialist for glaucoma and other eye diseases, but Plaintiff was not scheduled or seen by the specialist.

On March 19, 2007, Plaintiff filed an emergency appeal complaining of his medical problem, including how Youssef rejected Dr. Akanno's initial referral to be seen for eye pain and vision loss.   The appeal was not processed as an emergency appeal as it should have been.  On April 21, 2007, M. Ali, R.N., interviewed Plaintiff and told Plaintiff that if he withdrew the

appeal, Ali would ensure that Plaintiff would be seen within thirty days by an ophthalmologist. Plaintiff withdrew the appeal in good faith.  Both Defendants Ali and Wright-Pearson, R.N.s, agreed to these terms and signed off on the grievance.  However, Plaintiff alleges that he was not scheduled or seen as agreed upon.

On July 5, 2007, Plaintiff resubmitted the withdrawn appeal, alleging deception by Defendants Ali and Wright-Pearson and explaining that he had partial vision loss in his left eye. Plaintiff's criminal appeal attorney wrote a letter to Warden Hedgpeth and CMO Lopez regarding Plaintiff's medical problems with his eye and back.  The letter urged them to abide by the Plata ruling and ensure Plaintiff received needed medical care.  Hedgpeth and Lopez wrote the attorney back, assuring him that Plaintiff was receiving adequate medical care.  However, Plaintiff alleges that he was not receiving adequate medical care.

On August 31, 2007, Plaintiff was finally examined by the specialist who administered a series of eye tests.   Plaintiff discovered through discussion with the doctor and the results of the visual field test that Plaintiff suffered a partial loss of vision in his left eye.  The specialist requested that Plaintiff be returned in six weeks for follow-up care, however Plaintiff alleges that he was never returned to the specialist and has not had his pressure checked to see if the glaucoma was worse.

## B.    Medical Care for Lower Back Pain

On October 2, 2006, Plaintiff filed an Accommodation Request on CDCR Form 1824 requesting medical care, to have his medical chronos reviewed, pain medication and/or possible surgery to relieve back pain in his lower back.  The Form 1824, equivalent to a CDCR-602 form, was filed after Plaintiff had filed numerous medical requests to have the chronos reviewed and treatment for his back.  On April 17, 2007, the appeal was denied at the final level of review without relief.

On April 11, 2007, Plaintiff was examined by orthopedic specialist Dr. Lewis.  Dr. Lewis prepared a report recommending that Plaintiff be seen by a pain management specialist, Dr.

Langlos, and be issued a lower bunk chrono.  Dr. Lewis recommended that Plaintiff be returned to his office in six weeks for a follow-up visit.  Plaintiff was not provided any of the treatment recommended by Dr. Lewis.

Plaintiff alleges that he has suffered daily since his arrival at KVSP as a result of denial of treatment.  Plaintiff is subjected to serious pain from having to climb up and jump down from the top bunk, fifteen to twenty times daily, without any apparatus to assist him.  Plaintiff suffers back pain throughout the night as a result of not having a medical mattress.  Plaintiff suffers whenever he has to lie prone on the ground for hours during emergency situations because Defendants will not provide him with a chrono, although medical records reveal that Plaintiff should not extend his spine due to lordosis.  Plaintiff contends the pain disrupts his daily activities.

**III.   Summary Judgment Standard**

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c).   Under summary judgment practice, the moving party

> [a]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e);

Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, Anderson, 477 U.S. at 248; Nidds v. Schindler Elevator Corp., 113 F.3d 912, 916 (9th Cir. 1996), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, Matsushita, 475 U.S. at 588; County of Tuolumne v. Sonora Community Hosp., 263 F.3d 1148, 1154 (9th Cir. 2001).

In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial." Giles v. Gen. Motors Acceptance Corp., 494 F.3d 865, 872 (9th Cir. 2007).  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56©.  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party,  Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) (per curiam)).  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).

Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

## IV.   Eighth Amendment

In order to state a § 1983 claim for violation of the Eighth Amendment based on inadequate medical care, a plaintiff must allege "acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." Estelle v. Gamble, 429 U.S. 97, 106 (1976).  Plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind.  Wilson v. Seiter, 111 S.Ct. 2321, 2323 (1991).

The requisite state of mind for a medical claim is "deliberate indifference." Hudson v. McMillian, 112 S.Ct. 995, 998 (1992); Wilson, 111 S.Ct. at 2323.  Deliberate indifference is present "when prison officials deny, delay or intentionally interfere with medical treatment," or it may be shown "by the way . . . prison physicians provide medical care." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992) (cites omitted).  While neither negligence nor medical malpractice is sufficient to violate the Eighth Amendment, a plaintiff is not required to show a complete failure to provide medical treatment.  Rather, "deliberate indifference" may be shown by conduct amounting to a total failure to competently treat a serious medical condition, even if some treatment is prescribed.  See, Ortiz v. City of Imperial, 884 F.2d 1312, 1314 (9th Cir. 1989).

### A.   Medical Treatment

#### 1.   Eye Pain[3]

##### a.   2006 allegations

In support of their motion, Defendants submit the declaration of S. Yaplee, M.D., a licensed physician and ophtalmologist certified by the American Board of Ophthalmology.

---

[3] In the second amended complaint on which this action proceeds, Plaintiff does not allege any deliberate indifference relating to his prescription eyewear.  In his deposition, Plaintiff indicates that he needs transitional lenses when he goes out into the sun. (Pl.'s Dep. 88:12-16.)  Although this claim is not properly pled, the Court notes that Defendants' evidence establishes that Plaintiff could always wear regular sunglasses, a hat or simply shade his eyes when going outside on sunny days.  (Yaplee Decl. ¶ 15; Pl.'s Dep. 88:24-25.)  Lack of transitional lens eyeglasses will not cause Plaintiff any injury or significant pain.  Transitional lens eyeglasses are not medically necessary in Plaintiff's case.  (Yaplee Decl. ¶¶ 15, 18.)

Plaintiff was one of Dr. Yaplee's patients.  Dr. Yaplee reviewed relevant portions of Plaintiff's medical file, attached as exhibits, in making his declaration.

Plaintiff's central allegation is that there was a delay in getting a referral to an eye specialist.  Dr. Akanno referred Plaintiff, and CMO Youssef denied the referral.  Dr. Akanno then referred Plaintiff to optometry to have his eye pressure checked.   Dr. Yaplee's declaration establishes that Plaintiff has been prescribed medication for his glaucoma since 1996, and the prescription is within the standard of care for glaucoma, as it works by lowering plaintiff's intra-ocular pressure.  (Yaplee Decl. ¶ 5.)

Dr. Yaplee's declaration also establishes that Plaintiff's visual acuity test showed equal eyesight left and right.  Although there is a visual field defect in his left eye, Dr. Yaplee concluded that there was no objective finding that could explain the defect.  (Id. ¶ 13.)

Mere delay alone in medical treatment does not constitute deliberate indifference.  Shapley v. Nevada Bd. of State Prison Com'rs, 766 F.2d 404, 407 (9th Cir. 1985).  A plaintiff must show the delay caused him serious harm.  But see  McGuckin, supra at 1060 (plaintiff not required to show "substantial harm").  In addition, a prisoner must show that defendant knew that aid was required, had the ability to render that aid, yet "sat idly by."  Id.  In other words, deliberate indifference is a function of the seriousness of prisoner plaintiff's medical needs and the wrongfulness of the defendant's actions in light of those needs.  McGuckin, supra at 1061.

Any claim that a delay in referral to an eye specialist caused Plaintiff further pain or injury is belied by Plaintiff's testimony in his deposition that the throbbing pain and loss of vision was a one-time event in September or October 2006.  (Pl.'s Dep. 75:2-15; 81:3-25.)  Plaintiff's subjective complaints of loss of visual acuity or blurriness in his left eye are contradicted by visual acuity tests which demonstrate equal eyesight left and right.  (Yaplee Decl. ¶¶ 7,9.)  Defendants have therefore met their burden on summary judgment regarding Plaintiff's allegations of deliberate indifference in 2006.

///

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**b.** **Glaucoma**

Defendants again submit the declaration of S. Yaplee, M.D., regarding this issue.

Plaintiff suffers from chronic open angle glaucoma (COAG). Glaucoma is a disease in which the optic nerve is damaged, and is associated with increased pressure of fluid in the eye (intraocular pressure or IOP). COAG is painless and does not have acute attacks. The only signs are gradually progressive visual field loss, and optic nerve changes. The primary treatment for glaucoma is to lower the IOP by medication. (Yaplee Decl. ¶ 4.) Plaintiff was prescribed medication for his glaucoma. He has been on this medication since 1996. The medication prescribed is within the standard of care of glaucoma, and works by lowering the IOP. Id.

Plaintiff was first seen by Dr. Yaplee on August 31, 2007, for complaints of vision loss to his left eye and to check his IOP. Plaintiff presented with complaints of "on and off" left eye throbs along with a gradual decrease in both visual field and visual acuity in his left eye since August 2006. Dr. Yaplee tested Plaintiff's IOP, which was in the normal range. He also performed other tests, including visual acuity. Dr. Yaplee declared that Plaintiff's visual acuity tests showed equal eyesight left and right. Dr. Yaplee further noted that this is not consistent with Plaintiff's subjective complaint that visual acuity was slowly decreasing in Plaintiff's left eye. There was no objective finding by Dr. Yaplee that could support Plaintiff's complaint of throbbing pain in his left eye. Objectively, the only abnormal finding was a defect in the temporal field of vision respecting the vertical meridian in the left eye. The visual field test is not entirely objective since it relies on input from the patient and it thus can be manipulated. Plaintiff's visual field defect in the left eye is not consistent with defects caused by glaucoma. (Yaplee Decl. ¶¶ 6- 11, 13-16, 18.)

Plaintiff was again seen by Dr. Yaplee on April 17, 2009. Plaintiff complained of throbbing pain, and blurred vision in his left eye that was getting worse. Dr. Yaplee tested Plaintiff's IOP, which was in the normal range. Dr. Yaplee also tested Plaintiff's visual acuity,

visual field, and performed an optical coherence tomography (OCT).[4]  The visual acuity test showed equal eyesight left and right.  The visual field test showed a temporal visual field deficit in the left eye respecting the vertical meridian.  In Dr. Yaplee's view, there was no objective finding that could explain Plaintiff's visual field deficit in his left eye.  Dr. Yaplee concluded that the problem was intra-cranial, possibly near the part of the brain where the optic nerves partially cross.  Dr. Yaplee recommended an MRI of Plaintiff's brain.  (Yaplee Decl. ¶¶ 11-13.)

Plaintiff was again seen by Dr. Yaplee on June 12, 2009.  Plaintiff complained of blurred vision in his left eye, but no pain.  The visual acuity test again showed equal eyesight left and right, contradicting Plaintiff's claim of loss of visual acuity in his left eye.  Plaintiff's IOP was in the normal range.  Dr. Yaplee also performed other tests for visual acuity and visual field. Again, there was no objective finding that could account for his visual field defect in the left eye. (Yaplee Decl. ¶ 14.)

On July 28, 2009, Plaintiff had an MRI, which showed atrophy of the left anterior frontal lobe.  Dr. Yaplee does not believe the frontal lobe atrophy explains the visual field defect in the left eye.  (Yaplee Dec. ¶ 16.)

Plaintiff presented to Dr. Yaplee on September 11, 2009, complaining that his eyes were "changing."  Dr. Yaplee performed an IOP test that was in normal range, and performed visual acuity and visual field tests.  (Yaplee Decl. ¶ 17.)

Based on his education and experience, Plaintiff's medical records (including the MRI report) and the examination and tests he performed, Dr. Yaplee's medical opinion regarding Plaintiff's treatment for glaucoma follows:

> Singleton has COAG which is being properly treated and controlled by medication.
>
> Singleton's visual field defect in his left eye is not consistent with defects caused by glaucoma.

---

[4] An OCT is an imaging device for the posterior segment of the eye and can measure the retinal nerve fiber layer thickness (RFNL).  In Plaintiff's case, the RFNL was within normal limits.  (Yaplee Decl. ¶ 11.)

10

Singleton's visual field defect in his left eye is not caused by lack of ophthalmological  care.

My examinations and tests were diagnostic, and delay, if any, in my seeing Singleton did not result in any harm.

The MRI was diagnostic, and delay, if any, in obtaining it did not result in any harm to Singleton.

Singleton's subjective complaints of loss of visual acuity or blurriness in his left eye are contradicted by three visual acuity tests which demonstrate equal eyesight left and right.

Singleton's subjective complaints of intermittent, throbbing pain in his left eye have no objective support.

(Yaplee Decl. ¶ 18.)

The Court finds that Defendants have met their burden on summary judgment.  Dr. Yaplee's declaration establishes that Plaintiff has been treated for glaucoma since 1996. Specifically, Plaintiff has been treated with medication that addresses Plaintiff's IOP.  Dr. Yaplee's declaration establishes, without dispute, that Plaintiff's treatment is within the standard of care, and his visual acuity has been tested and found to be equal, left and right.  This evidence establishes that Defendants were not deliberately indifferent to a serious medical need of Plaintiff's.

Plaintiff's central complaint is that Defendants have not addressed his concerns fast enough, and that Defendants have not been able to properly diagnose his visual defect. Defendants' evidence establishes, without dispute, that they have made reasonable efforts to diagnose the cause of Plaintiff's visual defect.  Defendants' evidence establishes that Plaintiff has been treated appropriately for his glaucoma, and that any delay in Plaintiff's evaluation and treatment for his glaucoma has not caused Plaintiff any injury.

### 2.    Lower Back Pain

On October 2, 2006, Plaintiff sought medical care for his back by the filing of a CDCR Form 1824, and accommodation request.  Plaintiff filed his 1824 after filing numerous requests to "have his chronos renewed and treatment for his back."  (Am. Compl. ¶ 19.)  Plaintiff's

11

accommodation request was denied "without no relief."  Id.

Plaintiff was examined by Dr. Lewis on April 11, 2007.  Dr. Lewis recommended that Plaintiff be seen by a pain management specialist.  Dr. Lewis also recommended that Plaintiff be issued a lower bunk chrono and be seen for a follow-up in six weeks.

Plaintiff was not issued a lower bunk chrono, nor was he seen for a follow-up.  Plaintiff alleges that he suffered daily from having to jump out of his upper bunk 15-20 times a day, and having to lay prone on the ground "for hours" during emergency situations.   On July 31, 2007, Plaintiff filed a writ of habeas corpus in state court, contending that defendants were not providing him with adequate medical care.  The state court issued an order "giving time to the federal receiver to see how it should proceed on plaintiff's state writ and orders to follow." (Am. Compl. ¶ 22.)  On September 9, 2008, the federal receiver issued a report.  As to Plaintiff's particular case, the report noted that Plaintiff did not receive a chrono as Dr. Lewis recommended, that Plaintiff never received the follow-up visit with Dr. Lewis, and that there were "significant delays in arranging plaintiff's consultations and in managing his pain." Plaintiff was seen by the pain management specialist on August 8, 2008.

Plaintiff specifically alleges that Defendants Youssef and Lopez were aware of Plaintiff's lower back pain, yet did not respond to any written requests by Plaintiff.  Plaintiff alleges that each named defendant "made plaintiff wait over 16 months to see the pain management specialist and 12 months before plaintiff was to see Dr. Lewis for the 6-week follow-up."  Plaintiff alleges that he did not receive medical care until after the federal receiver became involved.  (Am. Compl. ¶ 25.)

Defendants support their motion with the deposition of Plaintiff, the declaration of Chief Medical Officer Dr. Lopez and relevant portions of Plaintiff's medical record.

Plaintiff has relatively mild lumbar degenerative disc disease (DDD).  Disc degeneration is very common and is a natural part of aging.  Over time, all people will exhibit changes in their discs consistent with a greater or lesser degree of degeneration.  While disc degeneration is likely

1  to progress over time, the low back pain from degenerative disc disease usually does not get

2  worse and in fact usually gets better over time.  Rather than a disease, DDD is a degenerative

3  condition that at times can produce pain from a damaged disc.  (Lopez Decl. ¶¶ 4-5.)

4         Plaintiff claims that his back pain is a result of a fall from a horse in 1988.  DDD is not

5  caused by trauma.  In Dr. Lopez's view, given Plaintiff's relatively minor degenerative changes,

6  it is not possible that the 1988 incident is the cause of his present symptoms.  (Lopez Decl. ¶ 6.)

7         The treatment for mild DDD is anti-inflammatories, stretching and exercise.  Physical

8  therapy can also be helpful, but is not essential.  No treatment can reverse degenerative disc

9  changes, but this treatment can decrease or eliminate the pain and stiffness of DDD.  Anti-

10 inflammatories could not be prescribed for Plaintiff's DDD because he is allergic to them.

11 (Lopez Decl. ¶¶ 7-8.)

12        Regarding Plaintiff's care, Plaintiff had nerve signal tests and electromyography (EMG)

13 to determine if he has radiculopathy (damage of the nerve at the spinal cord level) or neuropathy

14 (disease of peripheral nerves).  The results were essentially normal.  The slight loss of nerve

15 signal intensity indicates mild bilateral sensory-motor neuropathy.  There are no findings to

16 suggest a lumbar radiculopathy, or significant neuropathy.  Plaintiff's examinations showed that

17 he had a normal walking gait, normal range of motion, normal reflexes and no muscle atrophy.

18 (Lopez Decl. ¶ 9.)

19        Plaintiff's mild neuropathy is very common.  Mild neuropathy can occur at any age, but is

20 more common among older adults.  Mild neuropathy can cause mild tingling or numbness or

21 pain. The treatment for mild neuropathy is anti-inflammatories, stretching and exercise.  (Lopez

22 Decl. ¶ 10.)

23        Regarding his physical capabilities, Plaintiff indicates that he exercised on a regular basis.

24 Plaintiff states that from 2006 to 2008, he was able to do 160-250 pushups at a time (8 to 10 sets,

25 20 to 25 repetitions per set).  (Pl.'s Dep. 22:9-19, 25:8-10.)   Plaintiff also performed 7 to 10 sets

26 of pull-ups, and was able to jog 10 laps around the yard.  (Id. 22:9-19, 24:12-22, 25:8-10.)

27

28                                                13

1 Plaintiff also exercised by performing jumping jacks and dips. (Id. 26:8-15, 26:16-17.)

2       While housed at KVSP, Plaintiff worked in the canteen thirty to forty hours a week,

3 which required him to stock shelves and break down pallets, do janitorial work and other

4 physical tasks.  Plaintiff also worked as a porter, which entailed mopping, lifting 5 gallon water

5 buckets, cleaning the showers, sweeping and other physical tasks.  (Id. 16:18-19:16, 20:14-22:5.)

6       Regarding the specific allegations that the recommendation for a lower bunk chrono and

7 referral to a pain management specialist was delayed, Plaintiff indicates that he does not know

8 the reason for the delay or if Defendants were responsible for the delay.  (Id. 37:8 - 41:25.)

9       During the period of the alleged delay, Plaintiff received the following treatments for his

10 lower back: pain medication, including acetaminophen and oxycontin (Id. 42:12-15); morphine

11 sulfate (Id. 51:11-19.); tylenol with codeine (Id. 45:19-46:2); Indocin (which Plaintiff refused)

12 (Id. 50:19-51:19.); physical therapy treatments (Id. 44:17-45:21); transcutaneous electrical nerve

13 stimulation (TENS) unit application to the lower back (Id. 45:31-4); heat application to the lower

14 back (Id. 46:16-23); instructions on stretching and strengthening exercise for his lower back (Id.

15 47:20-48:15.)   Plaintiff is currently prescribed Neurontin for his lower back.  No doctor has

16 recommended any other treatment.  No doctor has recommended that Plaintiff have surgery on

17 his lower back.  (Id. 48:18, 55:4-12.)

18       Regarding the specific need for a lower bunk chrono, in general, lower bunk chronos are

19 not issued for chronic back pain and are instead reserved for conditions that pose an immediate

20 threat to the patient's health, such as a seizure disorder.  (Lopez Decl. ¶ 12.)   Denying Plaintiff a

21 lower bunk chrono would not have been out of the standard of care.  Climbing into an upper

22 bunk would not have exposed Plaintiff to an excessive risk of substantial harm.  (Lopez Decl. ¶

23 13.)

24       As to Plaintiff's allegation that he was deprived of an extra mattress, extra mattresses are

25 not issued for lower back DDD.  A person suffering from lower back DDD would not benefit

26 from the extra softness and lack of support, and it may make the problem worse.  Denying

27

28                                      14

1    Plaintiff an extra mattress would not have been out of the standard of care, nor would sleeping on

2    a single mattress expose Plaintiff to an excessive risk of substantial harm.  (Lopez Decl. ¶¶ 14-

3    15.)

4           As to Plaintiff's allegations regarding lying prone, denying Plaintiff a chrono excusing

5    him from lying prone during a call-down on the yard would not have been out of the standard of

6    care, nor would refusing such a chrono expose Plaintiff to an excessive risk of substantial harm.

7    There is no medical reason Plaintiff cannot nor should not lie prone on the ground or get up from

8    the prone position, as proven by Plaintiff's vigorous exercise routine.  (Lopez Decl. ¶ 16.)

9           Regarding Plaintiff's allegations of failure to refer him to a pain management specialist,

10   given Plaintiff's condition, referral to a pain management specialist was not medically necessary.

11   Epidural injections were not medically necessary.  Any delay Plaintiff may have experienced in

12   being referred to a pain management specialist or in receiving epidural injections was of no

13   consequence.  (Lopez Decl. ¶ 17.)   Plaintiff's medical record contains many requests he made

14   for more or stronger pain medication.  He lists his level of pain as "8" (with "0" representing no

15   pain and "10" the most severe pain imaginable).  But the objective evidence – physical exams, x-

16   rays, MRI, nerve tests, Plaintiff's employment and calisthenics, prove that Plaintiff was not

17   suffering any significant pain.  It is more probable than not that Plaintiff exaggerated his lower

18   back pain for secondary gain, such as a lower bunk, extra mattress and pain medication.  (Lopez

19   Dec. ¶¶ 18-19.)

20          The Court finds that Defendants have met their burden on summary judgment as to

21   Plaintiff's claims that they were deliberately indifferent to his lower back pain.  Defendants have

22   come forward with evidence that establishes the lack of existence of a triable issue of fact.

23   Plaintiff alleges that Defendants knowingly disregarded a recommendation that Plaintiff be given

24   a lower bunk chrono and a referral to a pain management specialist.  Defendants' evidence

25   establishes that denying Plaintiff a lower bunk chrono would not have been outside the standard

26   of care for DDD.  Defendants' evidence establishes that the failure to provide Plaintiff with an

27

28                                                     15

1   extra mattress was not outside the standard of care, and could have worsened his condition.

2   **V.      Plaintiff's Opposition**

3          On March 25, 2011, Plaintiff filed an opposition to Defendants' motion, along with a

4   memorandum of points and authorities, a declaration and a statement of undisputed facts in

5   support of his opposition.  Plaintiff attaches  Exhibits M through Z to his declaration.[5]

6          Plaintiff's memorandum in opposition consists largely of conclusory arguments that

7   Defendants were deliberately indifferent to his serious medical needs.  Where Plaintiff refers the

8   Court to specific evidence, the Court will address Plaintiff's specific argument regarding the

9   particular evidence.

10          Plaintiff refers to the second amended complaint, treated as an affidavit, to support his

11   argument that his injury was not caused by glaucoma, but by a lack of care.  Plaintiff refers to the

12   section of the second amended complaint that includes his allegations regarding treatment for his

13   left eye.  The allegations indicate, at most, a delay in treatment.  Plaintiff does specifically

14   declare that he "discovered through discussion with and the results of the visual field test done by

15   the doctor, that he has partial loss of vision in his left eye."  (Am. Compl. 7:189-21.)  As noted

16   above, Dr. Yaplee's declaration establishes that there is no objective evidence of loss of visual

17   acuity, and Plaintiff's treatment of his left eye was within the standard of care.  That Plaintiff

18   declares that he suffered a partial loss of vision in his left eye does not create a triable issue of

19   fact.  Plaintiff is not a physician and has not offered any allegations in the amended complaint

20   that he was properly diagnosed as having a loss of visual acuity.   Plaintiff's evidence, in the

21   form of his own declaration, establishes at most  a disagreement with Dr. Yaplee about his

22   diagnosis and the cause of his pain.  A difference of opinion between the physician and the

23

24          [5] Plaintiff attaches Exhibits A through N to his declaration in support of Plaintiff's motion for partial
    summary judgment (ECF No. 131.)  The Court will address the merits of Plaintiff's motion below.  In considering
25   Plaintiff's opposition to Defendants' motion for summary judgment, the Court will review the exhibits attached to
    Plaintiff's declaration in support of his motion for partial summary judgment.  The Court will also treat the February
26   12, 2009, second amended complaint as a declaration in support of Plaintiff's opposition, as it is made under the
    penalty of perjury. McElyea v. Babbitt, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curiam); Lew v. Kona Hospital,
27   754 F.2d 1420, 1423 (9th Cir. 1985); F.R.C.P. 56(c)(4).

28                                              16

1   prisoner concerning the appropriate course of treatment does not amount to deliberate

2   indifference to serious medical needs.   See Jackson v. McIntosh, 90 F.3d 330, 332 (9th Cir.

3   1996); Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir. 1981).

4        Plaintiff refers to exhibits M and N to support his argument that a delay in treatment

5   resulted in vision loss.   Exhibit N is a copy of a Physician Request for Services.   Exhibit M,

6   undated, indicates that Dr. Akanno submitted an urgent request for optometry services.   The

7   request indicates that Plaintiff complained of left eye pain, swelling on and off.   The request

8   indicates that the principal diagnosis is glaucoma.   Exhibit N indicates that the request was

9   approved on September 1, 2006, and that Plaintiff was seen on July 14, 2006.   The rest of

10  exhibits M and N are copies of correctional policies regarding inmate medical services.   Nothing

11  in exhibits M or N establishes that any of the Defendants were deliberately indifferent to a

12  serious medical need of Plaintiff's.   The evidence establishes that Dr. Akanno sought an

13  optometric evaluation for Plaintiff, and that Plaintiff received the evaluation.   That Dr. Akanno

14  submitted the request as an urgent request does not create a triable issue of fact as to whether

15  Plaintiff was suffering from an objectively serious medical condition, or that any of the

16  Defendants were deliberately indifferent to it.

17        Plaintiff refers to his declaration at paragraph 2 to support his argument that "according to

18  the medical professionals, retinal artery or vein occlusion is a cause of sudden visual loss, aside

19  from "acute" glaucoma.  (Mem. Opp. 6:22.)  The evidence Plaintiff offers in support is his own

20  declaration that according to Plaintiff's research, his vision loss is caused by retinal artery or vein

21  occlusions.  Plaintiff offers no evidence that any medical professional diagnosed him with any

22  such condition.  Plaintiff establishes, at most, a disagreement with the diagnosis of prison

23  physicians.  He offers no competent, objective evidence that any of the Defendants were aware of

24  any such condition, or that Plaintiff was actually diagnosed with any such condition.

25        Plaintiff also refers to his Request for Judicial Notice and his attached exhibit.  Plaintiff

26  requests the Court to take judicial notice of his exhibit.  Plaintiff attaches a copy of a letter to

27

28                                          17

1    Kern County Superior Court Judge Michael Dellostritto from staff counsel for J. Clark Kelso, the

2    Receiver at the time for the California state prison medical care system.  The letter references

3    Plaintiff's glaucoma, and indicates that the letter "constitutes the Receiver's further status report

4    on the habeas claims of Mr. Singleton."  The letter indicates that Plaintiff is being treated for

5    glaucoma, and, at one point, noted that an ophthalmologist performed a visual field examination

6    which showed a defect.  The letter goes on to state that the ophthalmologist requested an MRI of

7    the brain, and that the MRI was pending as of the date of the letter, July 29, 2009.   The letter

8    also indicates that Plaintiff refused a scheduled visit with an ENT specialist.  A re-scheduled visit

9    indicated no significant findings.

10         The Court declines to rule on Plaintiff's request for judicial notice, as Plaintiff's exhibit,

11   assuming it could be properly authenticated or judicially noticed, does not create a triable issue of

12   fact as to Defendants' liability in this case.  There is nothing in the letter that establishes conduct

13   by any of the named Defendants in this action, nor is there any evidence that establishes that any

14   of the Defendants were deliberately indifferent to an objectively serious medical condition of

15   Plaintiff's.

16         In his statement of undisputed facts, Plaintiff refers to his exhibit R.  Exhibit R is a

17   Request for Health Care Services submitted by Dr. Grossman on February 27, 2007.  This

18   request indicates that Plaintiff had not been seen by an ophthalmologist for 18 months.  That

19   Plaintiff was not seen by an ophthalmologist does not, of itself, establish deliberate indifference.

20   Defendants' evidence establishes that when Plaintiff was seen on August 31, 2007, his IOP was

21   in the normal range, his visual acuity test showed equal eyesight left and right.  There was no

22   objective finding that could support Plaintiff's complaint of throbbing pain in his left eye.

23   (Yaplee Decl. ¶¶ 7-10.)

24         Plaintiff refers to his exhibit T, a letter from Plaintiff's attorney to the Warden Hedgpeth.

25   The letter, dated July 12, 2007, expresses concerns regarding Plaintiff's health care.  The specific

26   concerns regarding Plaintiff are that from August 2006 to July 12, 2007, he had not been seen by

27

28                                          18

an ophthalmologist, "nor has anyone responded to his numerous requests and complaints." As

noted in the preceding paragraph, when Plaintiff was seen for his glaucoma, he was found to

have normal IOP and equal eyesight left and right. The letter also indicates that Plaintiff had not

been provided with necessary lower bunk chronos, which would allow him to sleep on a lower

bunk with a medical mattress. Defendants' evidence established that denying Plaintiff a lower

bunk chrono would not have been out of the standard of care for Plaintiff's condition. Climbing

into an upper bunk would not have exposed Plaintiff to an excessive risk of substantial harm.

(Lopez Decl. ¶ 13.) Dr. Lopez further declared that in general, extra mattresses are not issued

for lower back DDD. A person suffering from lower back DDD would not benefit from the extra

softness and lack of support, and it may make the problem worse. (Lopez Decl. ¶ 14.) Denying

Plaintiff an extra mattress was not outside the standard of care, and sleeping on a single mattress

did not expose Plaintiff to an excessive risk of substantial harm. (Lopez Decl. ¶ 15.)

Plaintiff refers the Court to his exhibit U. Exhibit U is a copy of the referral for an

optometric consult, and the results of that consultation on August 31, 2007, by Dr. Yaplee. Dr.

Yaplee found that Plaintiff's glaucoma is controlled, and that Plaintiff's medication was changed.

The findings also refer to "optic neuropathy." In his declaration, Dr. Yaplee declares that, on

August 31, 2007, he noted that

> the only abnormal finding was a defect in the temporal field of
> vision respecting the vertical meridian in the left eye. There was
> no objective finding that could support his complaint of throbbing
> pain in his left eye. Sometimes, the medication for COAG can
> cause some discomfort or mild pain when applied, but not the
> intermittent, throbbing pain described by Singleton. I recommend
> a change in his medication, to see if this was the cause of his
> purported pain.

(Yaplee Decl. ¶ 10.) As noted above, Dr. Yaplee saw Plaintiff again on April 17, 2009. There

was no objective finding that could explain Plaintiff's visual field defect in his left eye. Dr.

Yaplee concluded that "the problem was intra-cranial, possibly near the chiasm - the part of the

brain where the optic nerves partially cross. I recommended an MRI of Singleton's brain." The

19

1   Court finds that Exhibit U does not create a triable issue of fact.  It does not indicate any

2   objectively serious condition that Defendants could have been aware of.  As noted, Dr. Yaplee,

3   after seeing Plaintiff a second time, concluded that the problem was intra-cranial, and ordered an

4   MRI.  That Dr. Yaplee was not able to definitively diagnose the source of Plaintiff's pain does

5   not subject Defendants to liability.  The evidence establishes that efforts were made to discover

6   the visual field defect in the left eye.

7          Plaintiff refers the Court to his exhibits V and W, which appear to be pages from a

8   medical textbook that discuss open-angle glaucoma and opthalmologic referrals.  Nothing in

9   these exhibits establishes that Plaintiff's treatment was outside the standard of care.  Exhibit W

10  indicates that sudden loss of vision requires "urgent or emergency opthalmologic consultation"

11  and that any gradual loss of vision should be referred for opthalmologic assessment.  There is

12  nothing in these exhibits, however, that indicates that the care received by Plaintiff constituted

13  deliberate indifference.

14          Plaintiff's exhibits X and Y relate to his need for transitional lenses.   As noted, there are

15  no allegations in the February 12, 2009, second amended complaint regarding transitional lenses.

16  Further, exhibits X and Y indicate that Plaintiff was recommended for transitional lenses in June

17  of 2009, and in October of 2010, recommended as medically necessary.  Plaintiff's exhibit Z is a

18  copy of the second level response to an inmate grievance filed by Plaintiff regarding transitional

19  lenses.  This response, dated December 29, 2008, indicates that

20              It is noted that you were evaluated on September 15, 2008.  At that
               time you refused to order non-transition lenses.  At the informal
21              level response, you were advised about the new KVSP policy
               stating that the issuing of transition eyeglasses to inmates is no
22              longer permitted unless there is a medical necessity for it.  There is
               nothing in your UHR indicating that you have a medical necessity.
23              You have also been advised to submit a request to be re-evaluated
               for glaucoma.  As of December 29, 2008, a request has not been
24              submitted.

25          Plaintiff's exhibits establish, at most, that in October of 2010, he was recommended for

26  transitional lenses.  This lawsuit was filed on January 18, 2008, and the second amended

27

28                                                  20

1    complaint was filed February 12, 2009.  There is nothing in exhibits X, Y or Z that establishes a

2    triable issue of fact as to whether any of the defendants were deliberately indifferent to an

3    objectively serious medical need of Plaintiff's in 2006, 2007, 2008 or 2009.

4    **VI**.   **Conclusion**

5         Defendants have come forward with evidence that establishes the lack of a triable issue of

6    fact - evidence that they were not deliberately indifferent to a serious medical need of Plaintiff's,

7    resulting in injury to Plaintiff.  Plaintiff's evidence establishes, at most, a difference of opinion

8    regarding the conclusions of medical staff and the course of his treatment.  That Plaintiff may

9    have a different view of the urgency of his condition, or the course of his treatment, does not

10   subject defendants to liability under the Eighth Amendment.  The evidence establishes, without

11   dispute, that Plaintiff's treatment for his lower back and glaucoma is within the standard of care.

12   Defendants' motion should therefore be granted.

13        The Court has considered Plaintiff's motion for summary judgment, and has reviewed the

14   evidence submitted by Plaintiff in support of his motion in analyzing Defendants' motion for

15   summary judgment.  The Court finds that Plaintiff's evidence submitted in support of his motion

16   does not "affirmatively demonstrate that no reasonable trier of fact could find other than for the

17   moving party." Soremekun v. Thrifty Payless, Inc., 509 F.3d 978, 984 (9th Cir. 2007).  Plaintiff's

18   motion should therefore be denied.

19        Accordingly, IT IS HEREBY RECOMMENDED that:

20        1.  Plaintiff's motion for summary judgment be denied.

21        2.  Defendants' motion for summary judgment be granted in favor of Defendants and

22   against Plaintiff.

23        These findings and recommendations are submitted to the United States District Judge

24   assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(1).  Within thirty days

25   after being served with these findings and recommendations, any party may file written

26   objections with the court and serve a copy on all parties.  Such a document should be captioned

27

28                                              21

1   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

2   shall be served and filed within ten days after service of the objections.   The parties are advised

3   that failure to file objections within the specified time waives all objections to the judge's

4   findings of fact.  See Turner v. Duncan, 158 F.3d 449, 455 (9th Cir. 1998).  Failure to file

5   objections within the specified time may waive the right to appeal the District Court's order.

6   Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

7      IT IS SO ORDERED.

8   **Dated:**   **February 3, 2012**                     **/s/ Gary S. Austin**
                                 UNITED STATES MAGISTRATE JUDGE